IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TREAN HOGAN, | ) | Case No. 1:25-cv-02682-RJS |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Trean Hogan ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. 405 (g) and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C (636(c)(1). As substantial evidence supports the ALJ's decision and because Plaintiff has failed to identify any error of law in the ALJ's evaluation of his case the Commissioner's final decision is affirmed.

## II. Procedural History

Plaintiff's mother, Andrea Narkita Hogan, applied for SSI benefits on his behalf, her then minor child, on April 23, 2023. (Tr. 80). Plaintiff attained age 18 on February 5, 2024. (Tr. 80). The application alleged a disability date of February 10, 2008. (*Id.*). The application was denied by a Social Security Administration adjudicator on December 27, 2023, and again on reconsideration on March 13, 2024. (Tr. 80-81). He requested a hearing before an Administrative Law Judge ("ALJ") on April 18, 2024. (Tr. 119). Plaintiff, represented by counsel, and a

Vocational Expert ("VE") testified before an AJ on December 9, 2024. (Tr. 48-71). Following the hearing the ALJ issued a decision denying Plaintiff's claim for benefits on April 7, 2025. (Tr. 7-28). On October 21, 2025, the Appeals Counsel denied further review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Plaintiff timely instituted this action on December 11, 2025. (ECF Doc. 1).

## III. Evidence

### A. Personal Evidence

Plaintiff was born on February 4, 2006. (Tr. 80). Under Social Security regulations, he was an adolescent at the time the application was filed and remained an adolescent until he attained age 18 on February 4, 2024. (Tr. 15). At the time of the decision, he was in twelfth grade and had a limited education. (Tr. 26) He has no past relevant work. (*Id.*).

### B. Educational Evidence

The Cleveland Metropolitan School District prepared an IEP to address Plaintiff's academic needs on March 3, 2022. (Tr. 275-96). The IEP noted that Plaintiff was enrolled in tenth grade, and he was receiving services in the areas of reading comprehension, writing and mathematics. (Tr. 276). His IQ composite score was measured at 80. (*Id.*). Based on the Woodcock Johnson Test of Achievement, Plaintiff's appropriate instructional level for reading was third grade. (Tr. 276-77). The Test of Written Language indicated a grade level below third grade for vocabulary, spelling, punctuation, logical sentences, sentence combining and story composition. (Tr. 277). On the Math Calculation subtest on the Woodcock Johnson Test of Achievement, Plaintiff's overall assessment was at the fifth-grade level. (*Id.*). Due to the test results, Plaintiff was provided accommodation, including small group settings, extended time to

complete tests (up to double), frequent breaks, test read/text to speech, and directions read aloud and clarified. (Tr. 291).

Plaintiff's final tenthgrade report card indicated that he failed English, Geometry and Health classes. (Tr. 254). His school disciplinary records indicated two suspensions in 2023 and four in 2024 for issues including fighting, skipping class or otherwise disturbing the learning environment. (Tr. 421). His IEP was updated on April 17, 2024, and new evaluations indicated his independent reading was second grade, his writing level was below third grade, and his mathematics level was fifth grade. (Tr. 959). The IEP indicated that he was distracted by his peers, and unable to focus on his academics. (*Id.*). There was also concern that his deficits in mathematics would affect real-world situations including banking, computing discounts and budgeting. (Tr. 964). Plaintiff's December 10, 2024, report card showed his grade point average as 1.409, and he ranked 82nd out of 87 students. (Tr. 423).

### C. Medical Evidence

On November 15, 2022, Plaintiff presented to the Staphanie Tubbs Jones Health center with left knee swelling and pain after a fall on concrete. (Tr. 658). He reported severe pain and instability in the knee, with locking and popping. (*Id.*). An x-ray of the left knee revealed a thin curvilinear osseous density along the medial aspect of the left medial femoral condyle, suspicious for a mildly displaced MCL avulsion fracture. (Tr. 684). There was moderate joint effusion with soft tissue swelling. (*Id.*). On November 21, 2022, Plaintiff met with his primary care physician, Ernest Yoshinobu Young, M.D., and reported that he slipped at a concert and his knee bent in a valgus/internally rotated position. (Tr. 656). He had been non-weightbearing since the time of the injury, and he was still experiencing pain and swelling. (*Id.*). On examination, his knee showed decreased range of motion, there was tenderness to palpation along his MCL, and

he had pain with an attempted straight leg raise. (Tr. 657). Plaintiff was provided a hinged brace, referred to physical therapy and scheduled for an MRI. (*Id.*).

Plaintiff had an MRI of the left leg on December 14, 2022. (Tr. 679-82). The MRI revealed a deep vein thrombosis ("DVT") in the popliteal vein at the level of the gastrocnemius muscle; multiple intra-articular osteochondral fracture fragments in the anterior, posterior and lateral joint with moderate joint effusion and synovitis; avulsion fracture of the inferomedial patella with osteochondral injury of medial and lateral patellar facet, with findings suggestive of patellar transient dislocation; impaction fracture of the lateral femoral condyle; and partial tear of the medial collateral ligament and medial retinaculum. (Tr. 681). Given the DVT that was found on the MRI, Plaintiff presented to the Lutheran Hospital Emergency Department on December 15, 2022. (Tr. 650). He was prescribed Eliquis and discharged. (Tr. 653).

On January 24, 2023, Plaintiff underwent a left knee diagnostic arthroscopy, arthroscopic-assisted removal of loose bodies, chondroplasty and MACI cartilage biopsy. (Tr. 615). He then had a physical therapy evaluation on March 13, 2023 where he reported that he was still having difficulty with walking, stair negotiation, bending, physical and recreational activities, activities of daily living, balance, edema management, flexibility, gait, independence in exercise, overall function, range of motion, strength, symptom management and tissue tenderness. (Tr. 620). His prognosis was determined to be excellent due to objective clinical presentation and good overall health status. (*Id.*).

By his third physical therapy visit on March 27, 2023, Plaintiff was demonstrating improvement in left knee active range of motion and progressed glute and quad strengthening without pain, and he continued to demonstrate valgus and hip external rotation with exercises. (Tr. 616). He did continue to have decreased weightbearing and stance time. (Tr. 617). At a

March 30, 2023 physical therapy session, Plaintiff admitted to continued left knee aches that have limited his ability to continue to progress, and intermittent recurrent mild effusions. (Tr. 612). He also reported mechanical symptoms along the underside of his patella but denied numbness or tingling distally. (*Id.*). It was determined that Plaintiff would next proceed with a left knee open MACI reconstruction to patella, patellar ligament shortening, and MPFL reconstruction utilizing semitendinosus allograft. (Tr. 614). Plaintiff underwent the procedure on April 23, 2023, and was referred to physical therapy. (Tr. 602).

A physical therapy progress report dated June 13, 2023, described minimal improvement in walking and physical activities. (Tr. 583). He continued to demonstrate impairment in gait, independence in exercise, overall function, range of motion, strength, symptom management that interferes with walking, stair negotiation, heavy exertion, physical and recreational activities, running, jumping and squatting. (*Id.*). His prognosis remained excellent. (*Id.*).

On September 20, 2023, Plaintiff reported to Trevor Telling, PA-C, at a five-month follow-up appointment that he was progressing well and had been able to return to many activities without pain or swelling. (Tr. 849). He did admit to crepitus and an intermittent catching sensation that was bothersome, but he was otherwise well and could swim and participate in "light basketball activities." (*Id.*). PA Telling expressed "some concern for overgrowth of chondrocytes" and recommended obtaining an MRI for further review. (*Id.*).

At a physical therapy re-evaluation on October 3, 2023, Kathryn Piraino, PT, noted that Plaintiff continued to demonstrate difficulty with lifting, recreational activities, running, jumping and squatting. (Tr. 830). He had met three of his therapy goals, and was progressing toward others, but still showed almost a 50 percent deficit in his left quadriceps. (*Id.*). PT Piraino heard

audible clicking in popping during the session and recommended that his exercise schedule be modified accordingly. (*Id.*).

Plaintiff underwent a left knee MRI on November 15, 2023, which showed intact medial patellofemoral ligament reconstruction of the left knee; immature appearing cartilage repair tissue inferior patella; scarring in the articular surface of Hoffa's pad in the anterior interval with an adhesion that appears to be attached to the cartilage repair site and the anterior cruciate ligament; generalized capsular thickening, a finding that can be seen with arthrofibrosis; and marked thickening of the patellar tendon, likely postoperative. (Tr. 805). On exam, there was palpable crepitus. (Tr. 807). At a physical therapy appointment on November 6, 2023, it was noted that Plaintiff was "progressing slower than expected toward functional goals based on home exercise compliance and appointment compliance." (Tr. 816).

**D. Opinion Evidence**

**1. State Agency Reviewers**

On December 27, 2023, state agency reviewing psychologist Martin Koretzky, Ph.D., opined that Plaintiff had less than marked limitations in the domains of acquiring and using information; and attending and completing tasks. (Tr. 76-77). Dr. Koretzky found no limitations in the remaining domains. (Tr. 77). On reconsideration, state agency reviewing psychologists Irma Johnston, Psy.D, and Dana Schultz, M.D., also found that Plaintiff had less than marked limitations in the domain of acquiring and using information; and attending and completing. (Tr. 85-86). Dr. Johnston and Dr. Schultz also opined that Plaintiff had less than marked limitations in the domain of health and physical well-being. (Tr. 86).

As Plaintiff attained age 18 prior to state agency reconsideration, Dr. Johnston also opined that Plaintiff had moderate limitations in the domains of understanding, remembering and

applying information; in concentrating, persisting and maintaining pace; and in adapting and managing oneself, but only mild limitations in interacting with others. (Tr. 87). Johnston determined that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (Tr. 89-90). Dr. Schultz found that Plaintiff could perform work at the medium exertional level, except that he would be limited to frequent climbing of ramps and stairs and occasional climbing of ladders, ropes or scaffolds. (Tr. 88). Dr. Schultz added that Plaintiff was limited to frequent kneeling and occasional crouching. (*Id.*).

**2. Consultative Examiners**

Plaintiff was seen by psychological consultative examiner J. Joseph Konieczny, Ph.D., on October 18, 2023, when Plaintiff was 17 years, 8 months old. (Tr. 795-97). At the time of the examination, Plaintiff was in the 11th grade, reported receiving "average-to-below-average grades" and was not involved in any disciplinary difficulties. (Tr. 795). He had no history of receiving psychological or psychiatric treatment services, and no history of problematic use of alcohol or drugs. (*Id.*). When queried about Plaintiff's disability, his mother indicated that he had "comprehension problems." (Tr. 796).

Dr. Konieczy's diagnostic impression was that Plaintiff suffered from borderline intellectual functioning, and specific learning disorder with impairments in reading (word reading and comprehension) and mathematics (calculation). (*Id.*). Dr. Konieczny opined that Plaintiff would have limitations in the domain of acquiring and utilizing information as a result

of his intellectual limitations and learning disorder. (*Id.*). Dr. Konieczny determined that Plaintiff had no significant limitations in the domains of attending and completing tasks; in interacting with and relating to others; or in self-care. (*Id.*).

**3. Other Providers**

**i. Tiffany Golden, Case Manager**

Ms. Golden completed a school activities questionnaire on April 26, 2024, after working with Plaintiff for five months. (Tr. 899-900). Ms. Golden noted that Plaintiff received accommodation at school, including small group settings, extended time, content delivered in smaller parts, directions read/clarified (as allowed), and use of a calculator, graphic organizers and sentence stems. (Tr. 899). She indicated that Plaintiff was very limited in his attention span in class and in his ability to work independently of teacher supervision; that he had difficulty with understand and completing assignment on time; that he was limited in his ability to progress in learning the skills involved in reading, writing and mathematics; that he had average ability to follow instructions; that he could respond appropriately to changes in routine; and that he responded very positively to criticism. (*Id.*). Ms. Golden added that Plaintiff was very respectful and has an excellent ability to get along with peers and teachers, though he sometimes engages with his peers at inappropriate times. (Tr. 900). She noted that Plaintiff exhibited appropriate hygiene and self-care. (*Id.*).

**ii. Alexander Perez, General Education Teacher and Intervention Specialist**

Mr. Perez completed a school activities questionnaire on November 14, 2024, after working with Plaintiff for three years. (Tr. 413-14). Mr. Perez opined that Plaintiff's abilities to work independently of teacher supervision and to understand and complete assignments on time was poor; that his attention and span and concentration in class, his ability to follow instructions

and to respond to change in routine were average; and that his ability to respond to criticism was good. (Tr. 413). Mr. Perez added that his experience was that Plaintiff got along well with peers and teachers and that he exhibited age-appropriate hygiene and self-care. (Tr. 414). Mr. Perez noted that Plaintiff was unable to participate in extracurricular activities because of his grades. (*Id.*).

**D. Hearing Testimony**

Plaintiff testified before an ALJ on December 9, 2024. (Tr. 57-65). As plaintiff testified, he was in twelfth grade, and that he attended both mainstream and special education classes. (Tr. 57-58). He stated that his best subject is science, and that he has the most difficulty with reading. (Tr. 58). He was sometimes provided extra time for tests in reading and math. (Tr. 58-59). He had recently been assigned an intervention teacher who could provide him with extra help. (Tr. 59).

As plaintiff testified, he tries his best to pay attention in class, but he has a very short attention span because of his ADHD and being distracted around people. (*Id.*). He denied taking any medications or being engaged in any mental health treatment. (*Id.*). He reported that he does not often have homework, but when he does, he will need his mother's help to complete his assignments. (Tr. 60). He sometimes pays better attention when moved to certain seats in class. (*Id.*). Plaintiff was attending a different school this year and was finding that he was better able to avoid distractions from friends in his current setting. (Tr. 61).

Plaintiff added that he can sometimes be lazy at home about doing chores and taking care of his personal needs. (*Id.*). On bad days at home, he does nothing but sit and relax, but on a good day he will first do everything that he needs to do. (Tr. 62). On bad days he will need more than one reminder from his mother to do his chores. (*Id.*). He stated that he normally gets along

with others, but he sometimes does not because of his social anxiety. (*Id.*). He has only one friend he spends time with outside of school. (*Id.*). When he is socially anxious, he will have anxiety attacks and have to leave the room to calm down. (Tr. 62-63). He is currently working on getting a driver's license and reports some restrictions resulting from his knee surgery. (Tr. 63).

Under questioning by the ALJ, Plaintiff testified he has not played basketball since his knee surgery, and that he spends his free time playing video games. (Tr. 64). He will play video games with his one friend when he comes over but mostly plays with people online. (*Id.*). His chores include doing the dishes, cleaning the bathroom, and cleaning his room. (Tr. 65).

Once Plaintiff's testimony concluded, VE Lauren Petkoff testified. (Tr. 66-70). For his first hypothetical the ALJ asked the VE to consider an individual with no past work who could work at all exertional levels, but would be limited to a static work environment, and would be able to tolerate few changes in a routine work setting; when any changes did occur they would need to be explained; would be limited to simple tasks; would be limited to work that does not involve any work tasks that would require arbitration, negotiation, confrontation, or being responsible for the safety of others or directing the work of others. (Tr. 66-67). The VE opined that such an individual could work as a store laborer, DOT #922.687-058, medium exertional level, SVP 2, with 46,000 jobs nationally; as a linen room attendant, DOT #222.387-030, medium exertional level, SVP, with 396,000 jobs nationally; and as a kitchen helper, DOT #318.687.-010, medium exertional level, SVP 2, with 18,000 jobs nationally. (Tr. 67).

For his second hypothetical, the ALJ asked the VE to consider all of the same restrictions from the first hypothetical, with the added limitations that the individual would be limited to occasional interactions with coworkers and occasional, superficial interactions with the general public, with superficial meaning that if a member of the public were to approach the individual

to ask directions to the nearest restroom they would be provided with information, but that would be the extent of any interaction that would take place. (Tr. 67-68). The VE opined that this individual could perform the same jobs, with the same national numbers, as the individual from the first hypothetical. (Tr. 68).

For his third hypothetical, the ALJ asked the VE to add the further restriction that the hypothetical individual would require breaks throughout the day for various reasons causing the individual to be off task 20 percent of any given workday. (*Id.*). The VE opined that this restriction would be job preclusive. (*Id.*). Similarly, if the hypothetical individual required frequent supervision, that would also be work preclusive. (Tr. 69). Under questioning by plaintiff's attorney, the VE also opined that an individual who is functionally illiterate and can only do basic addition and subtraction would be unable to perform the jobs previously cited, or any other work. (*Id.*).

## IV. The ALJ's decision

In his decision dated April 7, 2025, the ALJ made the following findings.

1. The claimant was a 16-year-old adolescent on April 23, 2023, the application date, and he remained an adolescent until he attained age 18 on February 4, 2024 (20 CFR 416.120(C)(4)).

2. The claimant has not engaged in substantial gainful activity since April 23, 2023, the application date (20 CFR 416.924(b), 416.920(b) and 416.971 *et seq*.).

3. The claimant has had the following severe impairment since the April 23, 2023 application date: borderline intellectual functioning, a specific learning disorder involving reading, and a specific learning disorder involving math (20 CFR 416.924(c) and 416.920(c)).

4. Prior to attaining age 18, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. Between the April 23, 2022[1], application date and February 3, 2024[2], the day before the claimant's 18th birthday, the claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. Because the claimant did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the claimant was not disabled prior to attaining age 18 (20 CFR 416.924(a)).

7. The claimant has not developed a new severe impairment or combination of impairments since he attained age 18 on February 4, 2024, but his borderline intelligence has continued to be a severe impairment (20 CFR 416.920(c)).

8. Since attaining age 18, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

9. Since attaining age 18, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:

- The claimant is limited to a static work environment – tolerating few changes in a routine work setting and when said changes do occur, any changes in the job duties will be explained.

- The claimant is limited to simple tasks.

- The claimant cannot perform work that involves arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.

- The claimant is limited to occasional interactions with co-workers.

- The claimant is limited to occasional superficial interaction with members of the public (by superficial the undersigned means if a member of the public were to approach and ask directions to the nearest restroom, the claimant would be able to provide such information, but that would be the extent of the interaction.),

[1] The application date was incorrectly identified in this finding as April 23, 2022. The correct date, as noted in the remainder of the findings, is April 23, 2023.
[2] This finding incorrectly identifies February 3, 2024 as the day before claimant's 18th birthday. As the claimant's birthday is February 5th, February 4, 2024 is the day before claimant's 18th birthday.

10. The claimant has no past relevant work (20 CFR 416.965).

11. The now 19-year-old claimant attained has been (*sic*) a younger individual in the 18 to 49 age group since February 4, 2024 (20 CFR 416.963).

12. The claimant, who is in the 12th grade, has a limited education (20 CFR 416.964).

13. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

14. Since the date the claimant attained age 18, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

15. The claimant has not been disabled, as defined in the Social Security Act, since April 23, 2023, the date the application was filed (20 CFR 416.924(a) and 416.920(a)).

(Tr. 15-28).

## V. Law and Analysis

### A. Standard for Disability

To qualify for SSI benefits, "(a)n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. 416.924(c). At step one, a child must not be engaged in "substantial gainful activity." 20 CFP 416.924(b) At step two, a child must suffer from a "severe impairment." 20 C.F.R. 416.924(c). At step 3, disability will be found if a child has an impairment, or

combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R 404, Subpt. P, App'x 1; 20 C.F.R 416.924(d).

To make the three-step determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. 416.926(a), Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R 416.926a(a). The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. 416.926a(b)(1)(i)-(vi).

With regard to adult cases, Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpt P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[3]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

---

[3] The regulations governing DIB claims are found in 20 C.F.R. § 404 *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416 *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404 *et seq.* unless there is a relevant difference in the regulations.

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Plaintiff raises a single issue for this Court's review: Whether the ALJ's decision is supported by substantial evidence where he failed to build a logical bridge between the record and his findings, selectively ignored probative educational evidence, and formulated an RFC that does not reflect his credibly established limitations. (ECF Doc. 10, p. 1). Plaintiff contends that the ALJ's decision was based on a selective accounting of the facts that "disregarded a consistent body of evidence demonstrating significant functional limitations." (*Id.* at p. 10). In Plaintiff's view, the ALJ found "less than marked" limitations in the domains of acquiring and using information and attending and completing tasks without reconciling those findings with the longitudinal evidence. (*Id.* at pp. 12-13). Further, Plaintiff argues that the ALJ included

limitations in the RFC that did not properly address his deficits in reading, mathematics and his ability to attend to and complete tasks and instead reflected "cherry-picked" references in the record indicating lesser restriction. (*Id.* at pp. 13-14). Finally, Plaintiff alleges a similar selective review of evidence concerning his knee impairment which the ALJ found to be non-severe. (*Id.* at p. 15).

In response, the Commissioner argues that the ALJ properly considered all relevant evidence in determining that Plaintiff had less than marked limitations in the domains of acquiring and using information and attending and completing tasks prior to achieving age 18. (ECF Doc. 11, p. 7). The Commissioner also claims that the limitations included in Plaintiff's RFC were supported by substantial evidence. (*Id.*). The Commissioner notes that the ALJ considered the opinions of Plaintiff's case manager and twelfth grade teacher, as well as the prior administrative findings when determining the RFC, and asserts that he appropriately discussed evidence that weighed both for and against granting benefits. (*Id.* at p. 10). Finally, the Commissioner argues that the ALJ similarly addressed all relevant evidence in concluding that Plaintiff's knee injury was non-severe. (*Id.*, at pp. 12-13).

**A. The ALJ created a logical bridge from the evidence to his findings of less than marked limitations in the domains of acquiring and using information and attending and completing tasks.**

A child's disability is "functionally equal" to the severity of a disability Listing when she has a marked limitation in at least two of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. 416.926a(a); *Elam ex rel. Golay v. Comm'r,* 348 F.3d 124, 127 (6th Cir. 2003). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to initiate, sustain or complete activities." 20 C.F.R 416.926a(a), e(2). Here, Plaintiff

contends that the ALJ erred in finding less than marked limitations in the domains of acquiring and using information and attending and completing tasks. (ECF Doc. 10, pp. 12-13).

The domain of acquiring and using information involves "the child's ability to learn information and to think about and use the information[,]" but the domain considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school. SSR 09-3p, 2009 WL 396025, *2-3 (S.S.A.). ALJs should consider whether the claimant has poor grades, inconsistent school performance, or special education services. *Id.* at *3. The ALJ may also consider the claimant's school attendance. *See* 20 C.F.R. 416.924a(b)(7)(iv-v) (special education, accommodations, attendance and participation considerations for children.). For adolescents (age 12 to attainment of age 18), relevant criteria for determining whether children are functionally typically for their age in this domain includes continuing to demonstrate learning in academic assignments; applying learning in daily situations without assistance; comprehending and expressing simple and concise ideas using increasingly complex language in academic and daily living situations; learning to apply knowledge in practical ways that will help in employment; planning ahead for future activities, and beginning realistic occupational planning. *See* SSR 09-3p, 2009 WL 396025, at *6.

Social Security regulations further explain that the domain of attending and completing tasks considers an adolescent's ability to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, independently plan and complete long-range academic projects, organize material and plan time in order to complete school tasks and assignments, and not be unduly distracted by peers or unduly distracting to them in a school or work setting. 20 C.F.R. § 416.926a(h)(2)(v).

When evaluating whether Plaintiff's impairments functionally equaled the listing, the ALJ determined that he had less than marked limitations in the domains of acquiring and using information and attending and completing tasks. (Tr. 20). In articulating his reasoning, the ALJ found that "[Plaintiff's] borderline intelligence and learning disorders can cause memory problems in addition to problems learning, interacting with others and concentrating." (*Id.*). He determined, however, that the suggestion that those concerns were disabling was not supported by the record as a whole, based on the following facts:

- Significant mental pathology is not noted in [Plaintiff's] medical records.
- No medical or school source has described [Plaintiff] as having had marked or extreme limitations with respect to his ability to understand, remember or apply information in an age-appropriate manner.
- No medical or school source has described [Plaintiff] as having had marked or extreme limitations with respect to his ability to maintain attention and complete tasks in an age-appropriate manner.
- Despite his borderline intelligence, [Plaintiff] has had a regular education, albeit with special education supports (see, again, Exs. 4E, 12E, 15E, 13F, 15F, and 16F).
- [His] school case manager described [Plaintiff] on April 26, 2024, as having an average ability to follow instructions (see, again, Ex. 13F). This same rating was given by [Plaintiff's] 12th grade teacher (see, again, Ex. 12E).
- [Plaintiff] was able to understand and answer questions during the above-mentioned June 12, 2023, claims representative interview (see, again, Ex. 1E).
- [Plaintiff] enjoys, and spends much time, playing video games (see, among other places in the record, Ex. 16F, p.5), an activity that requires some ability to concentrate, persist at tasks, and pace oneself.
- The above-mentioned 12th grade teacher described the claimant as having an average attention span and average concentration (see Ex. 12E).
- The consulting psychologist who met with [Plaintiff] on October 18, 2023, said [Plaintiff] did not have any significant limitations with respect to maintaining his attention and completing tasks (see Ex. 9F, p.2).

(Tr. 21-22). The ALJ also wrote that the school case manager noted that Plaintiff "rarely missed or was late for school" and that he was able to "keep up with peers in sports, games and other extracurricular activities." (Tr. 19). Finally, in assessing the opinions of the state agency reviewing psychologists and the consultative examiner relative to Plaintiff's pre-age 18 mental impairments the ALJ noted that none of the opinions offered evidence in support of disabling impairments, that the opinions were in "general alignment," and the opinions were persuasive because they were "internally supported and consistent with the evidence concerning [Plaintiff's] functioning prior to February 4, 2024." (Tr. 24).

The ALJ's robust review of the record refutes any claim of cherry-picking, as it clearly sets forth a well-reasoned evidentiary basis for his findings. Arguments that the ALJ mischaracterized or cherry-picked the record are seldom successful, because the same process can be described more neutrally as weighing the evidence and because crediting such arguments would require courts to reweigh the evidence. *See DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (noting that "cherry picking" allegations are seldom successful because crediting them would require courts to re-weigh record evidence); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."); *Downs v. Comm'r of Soc. Sec.,* 2020 WL 1684811, at *6 (S.D. Ohio Apr. 7, 2020), *report and recommendation adopted sub nom.*, *Downs v. Comm'r of Soc. Sec.*, 2020 WL 2216861 (S.D. Ohio May 7, 2020) ("The argument that the ALJ mischaracterized or 'cherry-picked' the record is frequently made and seldom successful, because 'the same process can be described more neutrally as weighing the evidence.'") (internal citations omitted).

More importantly, the fact that some evidence may support a contrary result does not take away from the fact that ALJ's findings are substantially supported. *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."). As noted above, it is well established that a reviewing court may not reverse, so long as the ALJ's analysis falls within a "zone of choice," a standard that is met here.

The ALJ cited substantial evidence in the record in support of his findings of less than marked limitations in the two domains in questions and built a logical bridge between the evidence and those findings, allowing for meaningful review by subsequent readers. Notably, he considered the information provided by Plaintiff's teacher and case manager that described his school attendance and performance, his ability to follow instructions, and his "average" attention span and ability to maintain concentration. (Tr. 21-22). The ALJ further considered Plaintiff's ability to interact with agency interviewers, as well as his ability to concentrate and persist in activities requiring attention and focus. (*Id.*). Additionally, the ALJ considered the opinions of the state agency reviewing psychologists and the mental consultative examiner, each of whom explicitly considered the records showing Plaintiff's borderline intellectual functioning and specific learning disorder before opining he had less than marked limitations, and found them to be persuasive. (Tr. 24). This analysis comports with the guidelines of SSR 09-3p and is therefore sufficient to survive scrutiny.

**B. The ALJ created a logical bridge from the evidence to the mental RFC.**

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v.*

*Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 61 Fed. Reg. at 34477.

The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Here, the ALJ appropriately considered and articulated his findings with respect to Plaintiff's residual functional capacity. In his decision, the ALJ found that Plaintiff had the following RFC:

> Since attaining age 18, [Plaintiff} has had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:
>
> - [Plaintiff] is limited to a static work environment – tolerating few changes in a routine work setting and when said changes do occur, and changes in job duties will be explained.
> - [Plaintiff] is limited to simple tasks.
> - [Plaintiff] cannot perform work that involves arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.

- [Plaintiff] is limited to occasional interactions with co-workers
- The claimant is limited to occasional superficial interaction with members of the public (by superficial the undersigned means if a member of the public were to approach and ask directions to the nearest restroom, [Plaintiff] would be able to provide such information, but that would be the extent of the interaction).

(Tr. 25).

The ALJ further noted that Plaintiff has not developed a new severe impairment or combination of impairments since he attained age 18 on February 4, 2024, but his borderline intellectual functioning has continued to be a severe impairment. (Tr. 24). He found that Plaintiff's impairment "can cause memory problems in addition to problems learning, interacting with others, and concentrating" but wrote that he had "accounted for those problems by finding [Plaintiff] has been limited to simple work with reduced social and stress demands." (Tr. 26). The ALJ noted that in support for the above assessment he had considered all the evidence concerning Plaintiff's functioning referenced when considering his condition prior to age 18 attainment. (*Id.*).

Plaintiff argues that the ALJ's review amounted to cherry-picking because he "selectively relies on evidence supporting a non-disability finding while ignoring substantial evidence to the contrary." (ECF Doc. 10, p. 11). Specifically, the Plaintiff suggests the ALJ ignored or mischaracterized evidence indicating that Plaintiff's reading and math proficiency levels were well below grade level and failed to consider the teacher opinions/reports regarding the deficits in Plaintiff's functioning. (*Id.* at pp. 12-13).

The ALJ's mental RFC is supported by substantial evidence. The ALJ noted that no medical or school source, including teachers, case managers, consultative examiners or state agency reviewing psychologists, described the Plaintiff as having marked or extreme limitations with respect to his ability to understand, remember or apply information, nor in his ability to

maintain attention or complete tasks. (Tr. 21). The ALJ noted that despite his borderline intelligence, Plaintiff has a regular education "albeit with special education supports," a qualification that indicates that the ALJ considered evidence both in support of and in opposition to his findings. (*Id.*). His case manager and twelfth grade teacher each found his ability to follow instructions to be average, and the ALJ noted that he was able to understand and answer questions during his claims representative interview. (*Id.*).

The evidence cited by the ALJ confirms that the limitations prescribed by the ALJ's RFC findings are sufficient to address concerns about Plaintiff's borderline intellectual functioning. While Plaintiff points to evidence in the file that he avers supports greater restriction, because the ALJ's RFC is supported by the substantial evidence outlined above, it must be affirmed even if the record contains evidence that would support a different result. *Emard v. Comm'r of Soc. Sec.,* 963 F.3d 844, 849 (6th Cir. 2020). I am not persuaded that the ALJ cherry-picked evidence to support his RFC determination; rather, I believe he performed a weighing of the evidence that I am loath to disturb. Thus, I do not order remand on this issue.

**C. The ALJ properly evaluated Plaintiff's knee impairment as non-severe.**

The regulations provide that findings of no limitations or only mild limitations generally result in a limitation being found to be non-severe. 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."); *Atterberry v. Sec'y of Health Hum. Servs.,* 871 F.2d 567, 572 (6th Cir. 1989) (The record as a whole and a finding that claimant was "somewhat or mildly depressed" showed that claimant did not have a severe mental impairment); *Carrelli v. Comm'r of Soc. Sec.,* 390 F. App'x 429, 435-36 (6th Cir. 2010) (non-

severe mental impairment despite moderate limitations). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

Plaintiff argues that the ALJ's determination that his knee impairment is non-severe was based on a selective reading of the record. (ECF Doc. 10, p. 15). Specifically, he claims the ALJ disregarded, without explanation, evidence of "objective imaging demonstrating adhesions, scar tissue and abnormal cartilage repair", as well as the need for ongoing physical therapy. (*Id.*). Plaintiff contends that the ALJ based his conclusion on a single notation indicating that he was "pain-free" two months after surgery. (*Id.*).

Plaintiff's argument gives short shrift to the ALJ's assessment of the knee impairment. While the ALJ noted the Plaintiff's own statement that he was "pain-free" two months after his knee surgery on April 23, 2023, he adds that Plaintiff's mother described him on June 12, 2023 as not having any physical limitations. (Tr. 15). The ALJ noted that Plaintiff himself did not allege a severe knee impairment in his own disability report submitted on June 12, 2023, less than two months after his surgery. (*Id.* (citing Tr. 243)). The ALJ wrote that mental consultative examiner wrote that Plaintiff showed no difficulties in movement or walking when he met with Plaintiff on October 18, 2023, (Tr. 18), and that Plaintiff's school case manager noted on April 26, 2024, that Plaintiff was "able to keep up with peers in sports, games and other extracurricular activities." (Tr. 19). The consulting psychologist further noted that Plaintiff was able to perform activities of daily living, including "cleaning his room, helping with dishes, and cleaning the bathroom." (Tr. 23). Finally, in finding the state agency reviewing physician opinions unpersuasive, noted that the limitation to the medium exertional level opined there was "not well

supported internally, and because there is no evidence of ongoing physical limitation since the claimant attained age 18 on February 4, 2024. (Tr. 26).

The ALJ clearly provided substantial evidence in support of his determination that the knee impairment was non-severe. While the Plaintiff invites this Court to re-weigh the evidence and implicitly address an MRI suggesting irregularity, but no specific functional limitation, I decline to do so. As noted above, the regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports their decision. *See Renstrom*, 680 F.3d at 1067. Here, the ALJ met that burden and arrived at a conclusion well within his "zone of choice." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). I therefore affirm the ALJ's finding that the knee impairment was non-severe.

## VII. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I affirm the Commissioner's final decision denying Plaintiff's applications for DIB and SSI.

Dated: October 30, 2026

Reuben J. Sheperd
United States Magistrate Judge